Our first case this morning is case number 4111110, People v. Sykes. For the appellant we have John McCarthy for the applelead, Denise Ambrose. Mr. McCarthy. Your honors, counsel, may it please the court. My name is John McCarthy and I represent the defendant, Duane Sykes. This is the second time this matter has been before this court. The first time it was here, this court remanded to the trial court to give it an opportunity to consider Mr. Sykes' post-trial motion. When it did this, this court pointed out several pieces of evidence that thought may have some impact on whether Mr. Sykes was actually proven guilty beyond reasonable doubt, including those where one of the state proved the amount of money that was in the drawer at the beginning of the day, the fact that there were no records or receipts were offered into evidence, none of the five other employees who had access to the cash drawer were ever interviewed, the DVD that was actually played to the jury was very grainy and had a lot of electronic interference, and Mr. Filney was allowed to testify not only to that, but also to what he said was a much clearer original DVD. Unfortunately, at the hearing for remand, defense counsel made no argument, the state made no argument, and the trial court summarily dismissed Mr. Sykes' post-trial motion, not really addressing many of the concerns this court had. Mr. Sykes is here today reasserting the fact that he was not proven guilty beyond reasonable doubt in this case. The state failed to prove a crime occurred, Duney's testimony narrating the videotape was inappropriate, and the tape introduced the trial by itself was so grainy and full of electronic interference, it does not prove my client guilty beyond reasonable doubt. Initially, there was no competent evidence that money was missing. When I examine this case, it reminds me of a law school evidence exam, where the purpose of the question is to show an understanding that when a witness testifies, he or she has to have first-hand knowledge of what they're testifying about. The first problem with the state's case is Mr. Thune came in and testified that it was store policy that the cash drawer would begin the day with $200 when it was the holiday season. So this was a different amount of money than would normally be stored in the cash drawer. However, this does not establish whether there actually was $200 in it at the beginning of the day. If it started out with a normal cash drawer of, say, $100, then that would explain the $100 missing at the end of the day. The second problem is Mr. Thune did not know when this store opened. The camera did start playing at 8 o'clock in the morning, and my client's actions occurred at 9.03 in the morning. So sometime between 8 o'clock in the morning and 9 o'clock in the morning, somebody had to come into the store with a $100 bill and give it to a clerk. Without that, there wouldn't be a $100 bill in the cash drawer because you don't start out a change drawer with a $100 bill because you can't use it to make change. However, no register receipt was offered into evidence showing that a $100 bill was handed over. More importantly, Mr. Thune would have had the opportunity to take the cash register receipts, which would tell him what time the $100 was received, the videotape showing the person handing the $100 bill to the clerk, and most important of all, the videotape would show the clerk taking the $100 bill and putting it in the far left-hand corner as opposed to lifting up the till and putting it underneath like most clerks do when they receive a high-dollar bill like that. But Mr. Thune failed to preserve any of the video except for this three-minute interaction with my client. Mr. Thune watched the video, decided my client was guilty, made a rushed judgment, became judge and jury, and failed to preserve any evidence that may exonerate my client or, in fact, implicate his guilt. The problem is, without this other evidence, you can't implicate my client. The second problem the state has is Mr. Thune never cashed or counted the money at the end of the day. He learned the drawer was $100 short. What does that mean, he learned the drawer was $100 short? The person who, at the end of the day, counts the receipts and all the cash, came to the conclusion that after assuming there's $200 at the beginning of the day and looking at the cash receipts and looking at the amount of money, somebody reported to him that the drawer was $100 short. So it would have only been $100 short if there was $200 at the beginning of the day. Exactly. And you're saying there's no proof that the state presented that there was $200. Correct. You have to have somebody testify with firsthand knowledge. Either Thune could have counted the money himself, or the state could have presented the witness who actually counted the money. Even if the state, this court wants to say the state established the money was missing. That's where the state's case really goes awry. Five or six other people had access to this cash drawer. But Thune didn't interview any of them. Once again, that's part of his rush to judgment. He saw the video, decided my client was guilty, and ended his investigation before it even began. The only evidence that is left is this grainy DVD, and this evidence is contaminated by the narration of Thune that my client is seen taking money out of the drawer. The problem with this is threefold. Once again, going back to our thing, Thune has no personal knowledge of what transpired at the time my client was allegedly taking the money. Because he has no personal knowledge, the only way this video comes in is through the silent witness theory. And the silent witness theory is a genesis of new technology, where we have 24-hour surveillance of everything. And we don't necessarily have somebody watching 24 hours at a time. That's the purpose of the tape. And historically, this tape couldn't come into evidence because nobody had personal knowledge. That was a requirement for the admission. So the solution was to have somebody come in, lay the groundwork for the video, tell them how the video was taken, where it was taken, and then let the tape speak for itself. In this example, in this case, the proper testimony would have been Mr. Thune to come in and say, here's where we set up the video camera. Here's how I retrieved the video camera. There are two or three reasons why a clerk would get into a drawer when he doesn't have a customer in front of him. One being to check for cash. One being to put new change into the drawer. Also, he could have testified that in order to get into the drawer, the sales associate has to put in his account number to identify him as the person who is entering the drawer at that time. Those are things the jury wouldn't normally know. They wouldn't know he had to put in a sales account number. They wouldn't know the reasons to get into the thing. That sets up the foundation for the rest of the tape. Once Thune testified that, well, I saw him take money out of the drawer, and oh, by the way, I have this great video that you guys can't see. It was just clear to me that that's what it was. That went way too far, and it was unfair. He had no personal knowledge. Now, the improper narration of this tape is critical, especially when you look at the effect it has on the jury. The prosecutor repeatedly told the jury they could trust Mr. Thune. In fact, during defense counsel's argument, defense counsel attempted to draw the jury's focus onto the videotape and said the only real evidence against you is the video. In rebuttal, the prosecution got up, and I'm going to quote this. It's not that long, but I think it's critical so you know what's on the jury's mind. Now, the law, as defense counsel tells you, is that the only evidence you've seen is this video. The judge is going to tell you the real law. The real law is the evidence that you should consider consists of the testimony of the witness and the exhibit, the video. Someone's sitting up here promising to tell the truth and telling you that's evidence. Whether it's a video or not, that's evidence. It counts the same way as the video counts. And one other short follow-up to that, the prosecutor said, now what defense memory is in her interpretation of the video doesn't matter. Justice's mind doesn't matter. It is what each one of you thinks you saw and what Mr. Thune says you saw. Now, the problem is that elevates Mr. Thune to the 13th juror in the jury room. You have two groups of jurors who walk in. You have one group who says, you know, I think I saw something. And you know what, I'm sure I saw something because Mr. Thune, he's an honest guy. And he says there's something there, so there's nobody going to convince me that I'm wrong. Then you have the other group of jurors who don't think they saw anything on the tape. And they're confronted in the back of their mind, but boy, you know what, Mr. Thune, he seems like an awful honest guy, and he said he saw it, especially on that real clear one that we didn't see. So I, you know, my client didn't have a chance. Do you know why they didn't show the original video to the jury? Mr. Thune failed to preserve it, which I don't understand in the first place why you transfer a VCR tape to a DVD because I believe courtrooms have VCRs too. And plus the VCR would have the entire day, so Thune can't get away with making these outrageous statements that I watched the entire day of tape and nobody did anything suspicious. So I can't remember from the record, is there something in the record that tells what happened to the VCR in a pretrial hearing or something? The VCR tape? I believe, and I'm not 100% sure as to what I know, that a defense counsel asked for it in discovery, and they found out that what Mr. Thune did was transfer this, and I don't know for sure, but I think they reused it. Just reused it? Yeah. If the DVD had been lost or destroyed, could Thune have testified to what was on it? I don't think he should, but even if he could, let's say that occurred, his testimony without any kind of tape or anything like that, I just don't think he could. But if he did, it's certainly less persuasive because the jury wouldn't have any visuals whatsoever. Because the fact of the matter is my client does open the drawer, and you can't see anything, and this allows the jury to fill in blanks that they wouldn't have if there was no video at all. I just don't think the state would even bring a case because he has no personal first-hand knowledge of what occurred, and I'm just not convinced that that evidence should ever be allowed. If there are no further questions, thank you. I see none, but you will have rebuttaled. Ms. Ambrose? Please support and counsel. There's no difference in this case with this court's previous opinion in Starks where you had police or correctional officers who were viewing a videotape of a riot, and they testified or narrated what was on the tape saying that because these defendants were in the background, that these were the guys and this is what they were doing, they were taking conduit out and passing it to other inmates. This court said that it was okay because they were providing some insight into the behavior and mannerisms of the defendants that the jury should be keying in on, and that it was based on their perception. How long did they have to look at that tape to figure out what they were seeing? In Starks? That's a good question. I don't know the answer to that. I don't know if they examined it and re-examined it. Well, the officers were familiar with the defendants. There was something they could add based on their knowledge. What was Thuny able to add based on his personal knowledge, not viewing the other videotapes, but over and above? He was well familiar with the defendants' mannerisms. Thuny? Presumably. Did Thuny know the defendant? Well, he identified him on tape as this is the defendant, so he would know who his employees are. He worked at the Berkner's store. Was there evidence in the record that he knew the defendant personally and knew his mannerisms? Well, the fact that he identified and said this is the defendant. Right, but he didn't testify to unusual gait or mannerisms or anything like that. No, but he said he's entering his sales associate number, which he knows you have to do to open the register. Right, but you can't see what numbers he's punching. No, but he would know whether the number he was keen in, whether his sales associate number is six digits or a number of digits, and he would provide insight into that. I mean, a sales associate number, I wouldn't know if it was three numbers or six, and he says, well, at this point, that's what he's doing. I don't think that would be disputed. It might be disputed what he punched in, but it wasn't disputed that the drawer opened. Right, right, it was not. Well, then, what does it add to have him say, the drawer opened? Okay, well, the drawer opened. By the way, Jerry, you can see that the drawer opens. Well, they can either see it or they can't. And he's reaching into the far left side where they keep the larger bills. He's cupping his hand. He was looking directly at the camera. Now, that part you wouldn't necessarily know from looking at the DVD because he's looking up at the ceiling. You don't know if he's looking up at a Christmas decoration, but he's saying, no, he's looking up at the camera. That's interesting. What if it was a Christmas decoration? How does Study know that he's looking at the camera? Well, because that's where the camera is stationed instead of… Is the camera on? The camera had to have been on, otherwise we wouldn't have… Ah, but did the defendant know that? And how could he know that by looking at it? Well, even if he thought it was on, he's looking right into the camera. Then why would he take money, knowing he's right on camera? Well, that's the opposite argument you could make. Right, but a lot of the people that parade through here are not particularly bright. I mean, if he wanted to steal money regardless, he thought he could do so surreptitiously. The fact that he's cuffing his hands, he's trying to make it… I want to go back to Starks because in Starks, the issue was the identification of the defendants. That's not an issue here. And in Starks, because of their mannerisms and the testifying witnesses' familiarity with them, the court said that would be an aid to the jury in making the identification. You don't have that in this case. I'm having trouble understanding how his testimony aids the jury, except for the fact that he's telling them, he's guilty, take my word for it. He's not making that explicit remark. He's saying… Well, he says here you see him taking the $100 out, and he's putting it into his left pocket. He didn't say he's taking… He says he appears to be taking a bill from the far left side, which is where the larger bills are kept, and he's rubbing his hand, and that he's taking the no sale receipt and walking away. There's no customer there. I mean, even if he is testifying to something that would be explicit from watching the tape, what harm is there? Because he's not telling the jury this guy is guilty. The problem is that the tape, if it was a writing, it would be illegible, right? So he's telling them… It's not that bad. I mean, I've… How many times have you watched it? The beginning of the tape, when he's standing there, is better than the part where supposedly the crime occurs. Yeah. I mean, I can't see certainly the denomination of the bill. I see it's from the far left side, and he's pretty talented at cupping it in his hand. Even as, I think, Justice Turner asked, if the tape had been lost, he could come in and testify to what he had seen. I cited two… It's a North Carolina case, but where the police department lost the videotape, and they allowed the officer to come in and testify about, I think it was a bank robbery, even though he was trained in narcotics investigations, and that was his particular talent. What about the fact that nobody testifies that the drawer started out with $200? Well, it's about the same quality of evidence as Furby, which I cited in my brief, where the owner of the restaurant says, well, there should have been this much money in the drawer, and there should have been, this is what the cash receipts should have been, and it was tentative testimony as to how much money should have been there. But our Supreme Court found that, nonetheless, there was sufficient proof that at least $300 was taken. Furby had the restaurant owner's testimony that he believed that $1,000 in cash should have been in his office desk when the restaurant closed, because he normally kept $400 in rolled coins and currency there. Cash register tape showed that the restaurant's receipts amounted to $658, and those receipts should have been added to the drawer. And the money normally left in the desk was gone the following morning. He's the person who puts the money there. That's the person who's testifying. Well, he said it should have been, so apparently he is not the person that put the money there. Well, from the rest of what you read, it sounded like it to me. Well, he says those receipts should have been added to the drawer. He says, I keep so many dollars in wrapped coins. He said he believed that that much cash was left in his office desk when the restaurant closed. He wasn't there when the restaurant closed. So, I mean, granted, it would have been much better, but you would assume that the person who starts out at the beginning of the day would alert somebody if the $200 wasn't there, but granted, it would have been better had... Okay. Summarize for me the evidence that proves beyond a reasonable doubt that $100 was missing, regardless of the video. Okay. He has the evidence that there should have been $200 to start off with, and that at the end of the day... Not that there was, but there should have been. There should have been, yes. It came to his attention that the drawer was $100 short. But that assumes there was $200. Assuming, yes. Then he looks at the video, and he sees this is the only suspicious activity from the entire day's events, and he's not leaving a paper trail, so obviously he's not getting change. What other explanation? And you see him cupping something in his hand, and then when he confronts the guy three days later, he says he doesn't deny that he stole the money. He says, this is not something I want to discuss. It's a tacit admission. Not the strongest case, but I'd say on equal footing with Furby. And would you like to grill me on something else? I understand you're doing the best argument you can, given the situation you're in. But I guess my question to you is, there should have been $200 normally. Is that enough? I mean, doesn't this have to prove there was $200 in that cash register? Well, you know, let's assume this wasn't cash, and all they had was, like, say, costume jewelry hanging up in like mazes or something. And he saw one of the employees surreptitiously, like, take something from one of the stands and stick it in his pocket. That would probably be enough, even though somebody doesn't necessarily know there are four such necklaces that should be hanging there. The fact that he perceives the suspicious activity and it comes to his attention, which is that was admitted into evidence without objection, so you have to give it its probative worth, that it was $100 short. Like I said, this case is borderline. Or does Furby say, I know that commencing November 1st, we have $200 in every cash drawer in the store to start, or is it somebody told me that the store policy is to start out with $200. That's what we do in the holidays. So I thought it was starting with $200, and when I was later informed that it was short, then that's... He said that the closing person is to leave $200. Now he doesn't say whether that's his directive, whether he has some information, based on whether he looked at the receipts. He said part of his investigation was looking at this videotape. He didn't say whether he examined... He did say the detail. So I would assume that if he's the store... Yeah, that he would be taking a look at the receipts as well. There was no testimony exactly to that effect. Well, I mean, the routine established by the manager in the restaurant case, or the owner, is a routine that he either participates in at times, or directs be done. And it's over a period of time, and he's the one that's testifying about it. Whereas Thun is somebody who's down in the chain of command, though still in a position to try to help the store with loss prevention. And he doesn't really have any control, none that we're aware of, about saying, start with $200, beginning whatever the... The holiday season, I suppose, now begins Labor Day. Yeah. I mean, that part would be, I'm the assistant manager, I'm the one that does that, and I direct them to either leave... I mean, that person testifying to that really would then add to Thun. Or to have the starting person say, yeah, I was the first one on the register. Or I was the last one on the register. Yes. If I left $200 in there, I didn't leave any $100 bills. That would be good. And I know you don't get to pick the prosecution's evidence. No. Or present it, I should say. Certainly it would have been nice to have shown the cash register receipt to show that there's $200 in the series of events. And also some testimony that... I don't know what larger bills to the left means. What's the largest bill? He said 50 to 100. He did testify. That would be kept on the top of the register? I mean, not below? No, he said to the left. To the left. That seems to be at variance with common experience. Well, it's a department store, and it's during Christmas when everybody overspends, perhaps. So apparently I would think there would be some type of documentary proof that that register started out that day with $200. Yes. But that was not introduced. That was not introduced. And there was one other point that Mr. McCarthy said, and I don't know if it was Tooney who didn't preserve the VHS tape. I would think he would be the one in control, but I don't remember that part. I just know that they said it was not available. I don't know who created the DVD. I guess Tooney did. But there was no objection to foundation. So are there any other questions? Thank you. Thank you, counsel. Rebuttal, please. Your Honor, I won't take too much of your time. I do want to clarify a couple of things. First, I'd like to address Justice Turner's question about if there was no video, would Mr. Tooney be able to come in and testify about what he saw? The answer to that is no. And the one thing he could come in and testify to, I believe, is he could identify every single person who was on the videotape, but he couldn't tell the jury what they did. And that's what happened in the North Carolina case that the State is relying on. There was a tape that was lost, and the officer was able to come in and say, I viewed the tape. I recognized the defendant because I knew the defendant, and he had an abnormal gait. And I recognized his gait. The State still had to prove a crime occurred over and above that testimony, and that's what the silent witness theory doesn't prevent. It doesn't prevent somebody from coming in and identifying somebody who's on a tape. And that's what happened in the Starks case. And the reason those officers were able to come in and identify the defendants is because this was a prison riot with 200 people in this tape, and they had familiarity with the defendants and their mannerisms, and they were able to identify them. It would have been tough for a jury to do. And lastly, the Furby case. It does not... There's two distinctions. First, in Furby, all the money was stolen. And the store owner didn't say, I normally keep $400 in the drawer. He testified, when I left, there was $400 in the drawer. The only speculation they had to do was whether there was another $658 taken to make it over $1,000. And they presented the only evidence they had of that, which was the register tape. So that's completely different than trying to say that we're $100 short. So if there are no further questions... Seeing none, thanks to both of you. The case is submitted, and the court stands in recess.